UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

ALIOUNE DIENG,

                              Plaintiff,

            -against-

THE CITY OF NEW YORK, POLICE OFFICER RUSSELL LEWIS, POLICE OFFICER CLEMENT KRUG, POLICE OFFICER STEPHEN CAREY, POLICE OFFICER DONALD SEHL, AND SERGEANT DAVID CAMHI,

                              Defendants.

-----------------------------------------------------------------------x

FIRST AMENDED COMPLAINT

13 Civ. 2079 (SAS)

JURY TRIAL DEMANDED



## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5.     Plaintiff demands a trial by jury in this action.

## PARTIES

6. Plaintiff Alioune Dieng ("Plaintiff" or "Mr. Dieng"), an African-American male, is a resident of the County of New York, City of New York.

7. Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

8. Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

9. The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10. At all times relevant herein, Defendant Police Officer Russell Lewis ("Lewis") was an officer, employee, and agent of Defendant The City of New York.

11. At all times relevant herein, Defendant Lewis was acting within the scope of his employment with Defendant The City of New York.

12. At all times relevant herein, Defendant Lewis was acting under color of state law.

13. Defendant Lewis is sued in his individual and official capacities.

14. At all times relevant herein, Defendant Police Officer Clement Krug ("Krug") was an officer, employee, and agent of Defendant The City of New York.

15. At all times relevant herein, Defendant Krug was acting within the scope of his employment with Defendant The City of New York.

16. At all times relevant herein, Defendant Krug was acting under color of state law.

17. Defendant Krug is sued in his individual and official capacities.

18. At all times relevant herein, Defendant Police Officer Stephen Carey ("Carey") was an officer, employee, and agent of Defendant The City of New York.

19. At all times relevant herein, Defendant Carey was acting within the scope of his employment with Defendant The City of New York.

20. At all times relevant herein, Defendant Carey was acting under color of state law.

21. Defendant Carey is sued in his individual and official capacities.

22. At all times relevant herein, Defendant Police Officer Donald Sehl ("Sehl") was an officer, employee, and agent of Defendant The City of New York.

23. At all times relevant herein, Defendant Sehl was acting within the scope of his employment with Defendant The City of New York.

24. At all times relevant herein, Defendant Sehl was acting under color of state law.

25. Defendant Sehl is sued in his individual and official capacities.

26. At all times relevant herein, Defendant Sergeant David Camhi ("Camhi") was an officer, employee, and agent of Defendant The City of New York.

27. At all times relevant herein, Defendant Camhi was acting within the scope of his employment with Defendant The City of New York.

28. At all times relevant herein, Defendant Camhi was acting under color of state law.

29. Defendant Camhi is sued in his individual and official capacities.

## STATEMENT OF FACTS

30. On November 27, 2012, Mr. Dieng was lawfully present at True Sound Lounge located near the intersection of East 135th Street and Walnut Avenue in Bronx, New York.

31. At approximately 3:30 a.m., Mr. Dieng left True Sound Lounge on foot, walking along the sidewalk.

32. Upon arriving at 138th Street and Walnut Avenue ("Subject Location"), Mr. Dieng noticed a helicopter overhead.

33. Suddenly, a police car pulled up alongside Mr. Dieng as he walked on the sidewalk.

34. The individual defendants got out of the police car.

35. The individual defendants immediately approached Mr. Dieng and began patting him down.

36. Mr. Dieng told the individual defendants that they were conducting an illegal search.

37. The individual defendants told Mr. Dieng that they had reports of people committing vandalism on the rooftop of Bronx Finest Towing.

38. The individual defendants told Mr. Dieng that an eyewitness had identified him as one of the persons vandalizing the roof of Bronx Finest Towing.

39. The individual defendants told Mr. Dieng that, because he had been identified as one of the perpetrators, he was under arrest.

40. In fact, Mr. Dieng had not been identified as having been one of the persons vandalizing the roof of Bronx Finest Towing. See Affidavit In Support of Declining/Deferring Prosecution, annexed hereto as Exhibit "1".

41. The individual defendants had spoken to Arturo Martinez, an eyewitness to the vandalism on the roof of Bronx Finest Towing. Id.

42. Mr. Martinez told the individual defendants that Mr. Dieng had not been on the rooftop of Bronx Finest Towing. Id.

43. Mr. Martinez told the individual defendants that Mr. Dieng had simply been in the vicinity at the time of the incident. Id.

44. At no time did any eyewitness or police officer see Mr. Dieng on the rooftop or property of Bronx Finest Towing. Id.

45. The individual defendants also viewed surveillance video of the incident, and Mr. Dieng appeared nowhere in said video. Id.

46. Despite knowing this, the individual defendants placed Mr. Dieng under arrest.

47. The individual defendants continued to search Mr. Dieng's pockets and pulled out Mr. Dieng's cell phone and cell phone charger.

48. The individual defendants accused Mr. Dieng of having stolen the cell phone and cell phone charger despite Mr. Dieng telling them that the items belonged to him.

49. Defendant Camhi approved the arrest of Mr. Dieng at the Subject Location.

50. Mr. Dieng was transported to a police precinct by the individual defendants.

51. Once at the police precinct, Mr. Dieng was placed into a holding cell with two other individuals. These individuals laughed at him and told the individual defendants that Mr. Dieng wasn't the person that had been vandalizing the roof of Bronx Finest Towing with them.

52. At some point, Mr. Dieng was transported to Bronx Central Booking.

53. The individual defendants spoke with the Bronx County District Attorneys' Office, individually and collectively lying to the Bronx County District Attorney's Office that Mr. Dieng had violated New York Penal Law § 140.10(a).

54. Despite the fabricated allegations, the Bronx County District Attorney's Office declined to prosecute Mr. Dieng. Id.

55. At approximately 8 p.m., Mr. Dieng was released from Bronx Central Booking.

56. Mr. Dieng suffered damage as a result of Defendants' actions. Mr. Dieng was deprived of liberty, suffered emotional distress, mental anguish, fear, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983

57. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

58. Defendants, by their conduct toward Mr. Dieng as alleged herein, violated Mr. Dieng's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

59. As a direct and proximate result of this unlawful conduct, Mr. Dieng sustained the damages herein alleged.

## SECOND CAUSE OF ACTION
### *Unlawful Stop and Search*

60. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

61. The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Dieng without reasonable suspicion.

62. As a direct and proximate result of this unlawful conduct, Mr. Dieng sustained the damages herein alleged.

## THIRD CAUSE OF ACTION
*False Arrest*

63. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

64. The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Dieng without probable cause.

65. As a direct and proximate result of this unlawful conduct, Mr. Dieng sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION
*Denial of Substantive Due Process*

66. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

67. The individual defendants created false evidence against Mr. Dieng.

68. The individual defendants forwarded false evidence to prosecutors in the Bronx County District Attorney's Office.

69. In creating false evidence against Mr. Dieng, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Dieng's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

70. As a direct and proximate result of this unlawful conduct, Mr. Dieng sustained the damages herein alleged.

## FIFTH CAUSE OF ACTION
### *Failure to Intervene*

71. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

72. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

73. Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

74. As a direct and proximate result of this unlawful conduct, Mr. Dieng sustained the damages herein alleged.

## SIXTH CAUSE OF ACTION
### *Equal Protection Clause under 42 U.S.C. § 1983*

75. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

76. The Defendants' conduct was tantamount to discrimination against Mr. Dieng based on his ethnicity. This disparate treatment caused Mr. Gearles to suffer serious injuries.

77. The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, frisk, and arrest Mr. Dieng.

78. The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

79. One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

80. The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

81. The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

82. The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

83. According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black. Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics. By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops. The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of

stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

84. Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

85. Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

86. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

87. The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

88. Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

89. Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten

Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

90. Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases. Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

91. As a result of the foregoing, Mr. Gearles was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

## SEVENTH CAUSE OF ACTION
*Monell*

92. Mr. Dieng repeats and realleges each and every allegation as if fully set forth herein.

93. This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Dieng.

94. Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

95. Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

96. This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

97. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

98. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

99. Active officers are given promotion opportunities that are not afforded to inactive officers.

100. Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

101. The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

102. Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

103. Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

104. The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

105. Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

106. Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

107. Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

108. These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

109. Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

110. As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

111. Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

112. Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

113.    These policies, practices, and customs were the moving force behind Mr. Dieng's injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Dieng respectfully requests judgment against Defendants as follows:

(a)    Compensatory damages against all defendants, jointly and severally;

(b)    Punitive damages against the individual defendants, jointly and severally;

(c)    Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d)    Such other and further relief as this Court deems just and proper.

Dated: New York, New York
July 11, 2013

_____
Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiff
244 5th Avenue, Suite G247
New York, NY
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com